Hang on just a second. Okay, now you're good. I just wanted them to have a chance to get out before you came. You can come on up. All right, Mr. Hayden, you're on, sir, right? Good morning and may it please the court. In this case, Mr. Bilal Hankins asked a police officer for help looking for a lost dog and officers responded by following him, conducting a warrantless stop and pointing firearms at Mr. Hankins and his friends. A reasonable jury could conclude that the officer's actions violated Mr. Hankins' rights to be free from unreasonable seizures and excessive force. Now, we have explained why the doctrine of qualified immunity violates the text of section 1983 and I am, of course, happy to address any questions about that. But even under existing precedent, we think the district court was wrong to grant the officer's qualified immunity for two primary reasons. First, a reasonable jury could find that the officers had no reasonable suspicion to stop Mr. Hankins. Shortly before the stop, Mr. Hankins had affirmatively approached Officer Wheeler to ask for help and to explain what the group was doing. Indeed, Mr. Hankins provided his home address and pointed to his home a couple blocks away. That was not suspicious in and of itself and viewed in this context and in the light most favorable to Mr. Hankins, the other facts the district court identified do not give rise to reasonable suspicion either. Second, a reasonable jury could conclude that the officers had no reasonable basis to brandish their firearms at Mr. Hankins and his friends. Beyond the reasons why the stop itself was unreasonable, Mr. Hankins did not threaten the officer's safety or resist their demands after the group was stopped. The two issues have to be interconnected, correct? In other words, if the officers did have reasonable suspicion about car burglaries, clearly established law wouldn't say they couldn't unholster and point their guns, correct? Do you understand my question? In other words, you've got to win on the reasonable suspicion to be able to point to clearly established law that they can't unholster and step out at night and approach car burglars with a gun, right? So I think mostly correct. I think there, I don't know that if there, I think there would still be somewhat, a bit of daylight between the inquiries if the officers had a reasonable basis to stop someone. I think we would still ask whether the officer's use of force in approaching the group would, you know, is reasonable in context. I think here, you know, pointing the firearms at the group when they have, you know, sort of complied with what the officers have asked them to do and don't pose any other sort of physical threat, I think we would still say that would be unreasonable. That's the weakest approach to the case though, fair to say. In other words, I don't think there's a case out there that says that if you have reasonable suspicion at night that someone, multiple people were can't draw their guns. Yeah, you know, I, you know, to be, to be candid in terms of the case law that we discuss on excessive force, I don't think that we are pointing to fact patterns precisely like that. I think what we do see though, is that when you have, and this is, I think, not to anticipate questions here, but in the Flores-Rivas case, which is a district court decision, but sort of canvassing circuits across the country, the principle that is sort of distilled from those circuits is that pointing a firearm at compliant suspects or innocent bystanders is objectively unreasonable when other factors do not counsel in favor of force. Again, we would agree. Let's focus on the reasonable suspicion. In the case, of course, we have to take it in the light most favorable deal, but let's just be a bit of a devil's advocate. It was nighttime, correct? And there had been car burglaries. That's a very vague assertion, but there had been car burglaries and ultimately the car doesn't stop immediately. So when you put that amalgamation together, not reasonable suspicion to test the story that they're looking for a dog. Yeah. So I will, I'll unpack those, each one of those factors. So first as to the time of day, and again, this was a fact cited by the district court. You know, I think we have explained there is nothing inherently suspicious about driving at night. And I do want to point the court directly to United States versus Hill. I'm not sure our brief discussed the Hill case on this point in particular Hill considered about the same hour of night. This is the case involving a couple outside an apartment complex that was known as what a hotspot for crime and particularly drug crime. And the panel said there said that the couple was not out at unusual hour of night, but only at about 11 PM. And that was on a set. I agree with all the case. I think you accurately cited the case law. We'll hear if opposing counsel. My book, my point is you're right. Nighttime is not suspicious. Individually high crime neighborhood is not, I guess it's just a reasonable suspicion. It's pretty low. It's fact specific. If you put all these not individual factors together, still no reasonable suspicion. Yeah. So, um, I think you're exactly correct. Judge Higginson, that the question here is whether the totality of the circumstances give rise to reasonable suspicion. So we've realized that is the standard. I think in each factor you say, how close does this come to the line? Is it suspicious or not? And I think here we have just seen nothing that would sort of push these factors, which we believe are so non suspicious. These include being out at night. These include driving slowly and they do include asking an officer for help. We think these far so far short of the line of reasonable suspicion that we don't see how they sort of can march across the line for help. Certainly doesn't seem to be consistent with suspicion that someone's a robber. That's not often. I would think that robbers ask for help from the police. On the other hand, the police don't have to credit. It's such an odd scenario, but right. In other words, is there a case law that says that sort of an affirmative innocent act by somebody reduces suspicion in the reasonable suspicion context? Right. So I'd like to get at that at two ways. Um, so first in terms of how to look at what an officer should believe, I think any reasonable suspicion inquiry is what, what an objectively reasonable officer would believe. How would they process the information that's been provided to them? So I don't think we're saying officers have to believe what someone tells them every single time. But I think what stands out in this case is both the level of detail that these, that Mr. Hankins provided to the officers, the way he exposed himself. Again, he pointed to his home, he provided his home address. He even opened the vehicle door to ensure that officers could see him and everything the officers saw after that, after that initial communication corroborated his account. So, so I think that is an important way of looking at this case. Um, and the, the, the sort of the narrative that Mr. Hankins provided. Second as to the case law, I think we've highlighted the United States versus black case in particular and a lot of the reasoning the fourth circuit applied there does apply here. Um, so this is the case in which a man voluntarily offered his ID card to officers. The officers later cited that as quote overly cooperative as a basis for reasonable suspicion and the fourth circuit had none of it. The fourth circuit said this is not suspicious. And in fact, the obvious implication is that you would put an individual in a worse off position for having tried to cooperate or work with, work with officers in the first instance. And then here I would point to at least three parts of the record where we see the officers trying to justify this stop in the same way. So for example, officer Wheeler said, you may have been up to no good. Um, officer Pierre and that's at ROA 1911. Officer Pierre said officer Wheeler was somewhat suspicious of the story given to him. That's at ROA 2113. And finally in a white paper after this incident, um, the Orleans Levy Police Department said officer Wheeler suspected that the occupants may have provided a cover, a bogus cover story. So I think that's the same sort of suspicion based on cooperation that we see the fourth circuit reject. And in terms of the fifth circuit, I would say one area that this court has really has addressed in several cases is what to do with when an individual voluntarily looks at an officer. Um, I think that is the United States versus Moreno Chaparro case. And there are at least a few others. This court has rejected the notion that that is a basis for reasonable suspicion. So I think if you say it's not suspicious to look at an officer, it can't be suspicious, um, to offer your ID to an officer, then it is very hard to see how it is suspicious to approach officers and ask for help and provide the personal identifying information that Mr. Hankins did here. Um, I think to, to back up, um, Judge Higginson, you mentioned a couple other factors that are at play here and I want to make sure I address them. So time of day, I think again, we don't think it is suspicious and we think Hill has spoken to that question. Um, I also do want to address the sort of reference to car burglaries in the area. That's the language that officer Wheeler used. Um, as you sort of suggested, Judge Higginson, we think this is just far too general to satisfy this court standard for reasonable suspicion based on what may have happened in a neighborhood. Um, I think that, you know, the court has drawn a line between sort of just the rep sort of reputation for crime and specific incidents and reports of crime that may be connected to the individuals. Um, so that is why in McKinney, it was not enough that a drive by shooting had occurred early in the morning on the same day in the same location. In Hill, it was not enough that a couple was outside an apartment complex that was known itself as a hotspot for crime and particularly for drug crime. And in Gonzales, Gonzales Viguerta, it was not enough that a car was found where car burglaries had occurred in quote the same location. We think the references here are far looser, far more general than what we see in those cases where the court has really held the line on drawing inferences about a neighborhood itself. Um, and the final fact that I want to address that was raised is the vehicle's response, um, when officer Pierre flashed his blue lights. Um, and I want to tease out two points about that. First, the district court did not cite this fact as part of the reasonable suspicion analysis. Um, I don't think it's clear that it really falls under that heading. By that point, uh, officer Pierre had already flashed the blue lights. The officers claimed they had the suspicion for the stop in the first place. But I think even if you were to sort of consider the fact that the, that the car turned down an alley slowly before finally reaching a stop, we still don't think that reaches the level of sort of flight, um, or active, you know, resistance that this court has said may give rise to reasonable suspicion. Um, I think it's clear this, you know, sort of follows the United States versus Wardlow from the Supreme Court. This court has made clear again and again that there was a court site. Any fact that that was based on the officer's did the district court seem to infer something negative from it and yet you don't acknowledge that or is that wrong? So I want, I want to be careful about sort of the district court's inferences in two respects. So first I think the district court, even if it sort of took our account of facts like leaning out the window or perhaps even pointing a firearms, I think the real failure, if you're to try to diagnose it and how the district court looked at the facts here is looking at the totality of the circumstances in the light most favorable to us. And to be more specific, I think that's where Mr. Hankins initial request for help to, to, um, officer Wheeler just kind of fell out of the analysis of the district court's opinion. And he mentions it, he just says, um, excuse me, he mentions, uh, you know, the request for help and he seemed to say, but that doesn't alter the facts or suspicion or actions that the officers had, i.e., you know, perhaps a ruse or it's not a lot of mention, but he does acknowledge, uh, the client having asked for the help, but he says it doesn't alter, uh, that if this sort of low threshold, low bar that if they had reasonable suspicion, but I mean, it's just a line or two, there's not a lot there, but, but clearly in what he said, he acknowledged that point, but I don't remember seeing anything about the, uh, the other factors. Part of your argument, I guess you are in that he made credibility determinations or didn't construe it in the light most favorable. Is that part of your argument as well? It is. And Judge Stewart, there, there is, you know, we don't dispute the district court, of course, references the fact that Mr. Hankins approached the officers first. I think there, the district court really failed analytically to address the issue in two ways. And I'll start with the factual and then the legal. So factually back to sort of the totality of the circumstances, the facts here, the fact is that the car was driving slowly with the windows rolled down. I think the district court cited that as a basis for suspicion. And what you don't see here is any attempt really to reconcile that with the fact that Mr. Hankins had said they were looking for a lost dog that had escaped at night, sort of looking in the context of the account he had provided. And if I may, I think it would be much more suspicious if this group had been driving quickly or even at a normal pace after what Mr. Hankins told the officers or if the windows were rolled up. In other words, what the youth were doing was exactly consistent with what they had told Officer Wheeler. And I don't think the district court is taking that context into account as it looks at the other facts it did ultimately deem suspicious. And then the second aspect where we think the district court really didn't consider this initial encounter, this request for help, is what we had already discussed, which is the legal significance of voluntarily approaching an officer, asking for help, or communicating in any way. I don't think the district court grapples with this. We see, as you say Judge Stewart, sort of an acknowledgment of the fact. I think the district court, you know, appreciated it in some sense, but didn't grapple with what it means legally to infer suspicion from a request for help. And we have seen courts across the country, and this court, at least when it comes to looking at an officer, really reject the notion that we infer suspicion from that. And then as to the facts the district court did cite, I think you just do not see the consideration of the context in which this whole, you know, again, it is a request for help, an approach that sets this whole night in motion. And I think it should color the other facts that are being discussed. You want to speak to your client's assertion of an injury? Sure. So as to the excessive force claim, I mean, I think the threshold standard is some injury. And I do want to point the court in sort of looking at what that standard is. I think the Alexander case most recently and effectively assesses what it is in the excessive force context. As you know, Fifth Circuit law has developed a lot over time in looking at injury in the excessive force context. And Alexander says that even minor, even insignificant injuries or purely psychological injuries are sufficient when an officer's used excessive force. And here I would point the court to ROA 2808 to 2810. That discusses Mr. Hankins' three psychological injuries. First, they take the form of nightmares that have particularly focused on encounters with police officers. Second, he has suffered states of acute stress and anxiety, often involving, often in the presence of police officers, where he has to sort of withdraw himself from situations, effectively flee when he is around officers. What do you do with an officer's explanation that, in his experience, the slow-driving cars, people reaching out from the cars, are consistent to open the car doors that are parked there? In other words, it's consistent with their experience that this car theft is about? Sure, Judge Higginbotham. So I think two responses. First, sort of factually, I think we would again sort of urge that I think a reasonable officer would be viewing the slow driving, the looking out the window in the context of the encounter he'd already had with the youth. Again, we think having been told they're looking for a dog, I think a reasonable officer would not deem that conduct suspicious. And second, I want to speak directly to the point about what do we infer when an officer says, in my experience, this tends to happen. I think the court has been very disciplined in how it types of assertions from officers. And so if I could point again to the Hill case, there the officer said, you know what, this car is backed into a parking spot and they're outside this hot spot for crime. We know in drug crimes, cars back in so you can't see the license plates. And this court again said, you know what, that is just this general picture that emerges here is an ordinary one. This is a couple sitting outside an apartment on a Saturday night. I think again here, what you look to is the quote general picture. That's the language from Hill. These are kids out at night looking for a dog. And what's important is that this is not a case where the court is left guessing what is the general picture. They were already provided that account earlier in the night. And then they spent the next several minutes tailing these youths before ultimately pulling them over. What do we know about the alleged other car burglaries? Were they done by a BMW? Certainly there is no, you know, I think we have, we have no idea on current record. What we know is Officer Wheeler refers to the quote area. And I would, I would emphasize again that it's just so much less specific than what we have seen in other cases where the court has still not found reasonable suspicion. For example, in Hill, we have a specific apartment complex known for drug crimes. This court said that's not enough for reasonable suspicion. In Gonzalez, there had been recent car burglaries in quote the same location. And in of a quote gold SUV, the actual vehicle had been reported. The vehicle they encountered matched that description exactly. It was a gold SUV. And this court still said, you know what, we don't have a specific crime that we can link this driver or this vehicle to. We just have a report that it's suspicious here. We have no report about a BMW, as you know, Judge Higginson, and we have a no report about any, you know, prior specific burglaries and certainly not on the night in question. I think that just falls so far short of this court's standards for reasonable suspicion. Even if you sort of put this, I realize I've reached my time, so I reserve the remainder of time for rebuttal. Thank you. All right. Thank you. You have preserved your rebuttal time. All right. We'll hear from Mr. Hanna. Yeah. May it please the court. This case is about much more than the initial conversation Mr Hankins had with Officer Wheeler. This case is not about a wholesale acceptance of what an individual tells a police officer as the appellant wants to try to convey to this court. Officers have a right to investigate and to be suspicious of what they're told by people in certain circumstances, and these circumstances were present in this case. Here, Judge Fallon took into consideration numerous factors above and beyond what Mr Hankins told Officer Wheeler. The time of the day. It was late at night, nearly midnight. The actions of the car and the occupants. What you don't hear from the appellant is that there's uncontradicted evidence. Mr Hankins could not say that the front guest passenger was not hanging out the window at some point. When they approached Officer Wheeler, the rear window was down, and even if Mr Hankins did give an address, he certainly didn't give a cell phone number or any other readily accessible means of getting in touch with him if they were ostensibly looking for a dog. The actions of the car and the occupants driving slowly in this neighborhood at night, a neighborhood that had been the subject of car burglaries and theft. Where is that? That was based on Officer Wheeler's experience and Officer Pierre's experience having patrolled in this neighborhood frequently. This is the Hurstville Security District in uptown New Orleans, and their experience was that there were numerous car burglaries and thefts in that neighborhood. Was that presented to Judge Fallon? I'm sorry, Your Honor? Was that presented to Judge Fallon as part of? Yes, that was the part of the evidentiary record that was presented, the evidence. Thereafter, Officer Wheeler then decided to run the registration of the vehicle. Now, the plaintiffs want to say that there's a break in the chain that Officer Wheeler had affirmatively decided not to stop the vehicle. That's not true. Officer Wheeler was immediately suspicious. He ran the registration of the vehicle and noticed that the vehicle was registered to an officer who was miles and miles away from this neighborhood in the middle of the night. The rule of law, the case you've got is, if I live uptown and my dog gets away, which my dog does get away at night, and I'm going to look for it, and I see police, and I put my window down and say, could you help me look for my dog? They have reasonable suspicion to stop me? It's just not that factor alone, Judge Higginson. It's the totality of the fact. Well, what are the other factors that suggest that when I put my window down and ask a police officer to help me find my dog, what other factors show that actually there's reasonable suspicion to believe that I'm a car burglar? Well, I've already said I'm at night, and I've said my windows are down, and I've said, I think these are all not just undisputed, but they'd have to be taken in the light most to Hankins, and I'm stopping a policeman to say, could you help me find my dog? What else is there? But the officers had observed individuals leaning out of car doors, pulling on car door handles before. Okay, did they say that Hankins was pulling on a car door handle? I did not see that. Okay, so I'm asking you again, given in the light most favorable to Hankins at this stage, besides them being at night, and besides them stopping a cop and saying, could you help me find my dog, and they're driving slowly because they're looking for their dog, those are in the light, what else is there that shows these are actually car burglars? At that moment, the registration was run by Officer Wheeler. So that's it. It's if you're looking for your dog 10 miles away from where your house is. It's not a stolen car. No. So it's not a stolen car, it's his BMW. Not reported as stolen. So what case says that if you're registered miles from where a police officer happens to follow you, that gives reasonable suspicion of a felony offense? If it's a totality? No, no, no, I'm asking for a case on any of these facts. None of the cases. Okay, so what's your best totality case that this amalgamation of very innocent factors actually gives police officers in America the Well, our best case. Well, I mean, Gonzalez is not appropriate in the circumstance. And it's all this is not appropriate. I'm just asking you for you the best case in your brief, that the facts I've just identified that do seem uncontroverted. They ask a policeman to help them and it's at night and they're in their own car. What's your case that says, Oh, actually, that gives police this, I think they'd be stopping everybody that looks for their dogs at night. Well, we cited United States v. Paul, individuals located in a high crime area, a couple of other circumstances is sufficient to support finding of reasonable suspicion. And the other circumstances are present here, the time of day, the actions of the car and the information reported, the car's registration, auto burglaries in the area, and then ultimately, the fact that the car didn't immediately stop once the lights were turned on. All are suspicious actions on the part of the occupants of the vehicle, the driver of this car. And, and in Paul, the fact that the individuals were located in a high crime area together with a high crime area, you're not saying this is a high crime area in uptown New Orleans, are you? The fact that there may have been other burglars that doesn't make it a high crime area, come on. I think there's a significant amount of crime in Hurstville. Come on, are you, you describe, self-describe, can we quote you that that area in New Orleans is a high crime area? Well, Your Honor, As that term is, as that term is used in the cases. Certainly there is a level of criminal activity, thus the need, the need for a security district. As in many neighborhoods. Yes. But clearly, uh, there were multiple factors here that led to the reasonable suspicion for the stop. But, but according to Hankins, when Wheeler stops them, he doesn't list the factors you're telling us now. He says, quote, well, three young men in a nice car in this neighborhood. That was what Hankins reported. Well, we've got to consider that at this stage. That's Wheeler's reason. He doesn't say, oh, last night we saw a BMW at this hour stealing cars. He says three kids in a nice car in this neighborhood. But the facts before that certainly would justify the reasonable suspicion as Judge Fallon noted. Um, how did Judge Fallon, uh, incorporate that assertion by Hankins that the police officer who stopped him told him why he was stopping him? You three kids in this neighborhood, in this car, how did Judge Fallon deal with that fact? So you, you think police officers would say, you know what? This car resembles the car that last night was breaking into cars. If in fact the story you're giving us were the conclusive one. But instead, the officer says something very different. Well, the judge recognized that, uh, maybe being stopped is a disconcerting experience. But in this instance, officers Wheeler and Pierre acted on their objectively, objectively reasonable suspicion, and then entered their interaction with plaintiff in a reasonable- I know, but I'm asking you, what's objectively reasonable about saying three kids in a nice car in this neighborhood? Where's the objective reasonableness in that statement? That sounds like quite an incriminating statement about a police officer. Well, perhaps he didn't say everything to these individuals. But he didn't say anything. Perhaps he didn't say everything that he, uh, considered as part of the basis for the, uh, the stop or the decision to stop. But the commentary of Officer Wheeler, as recounted by Mr. Hankins, does not stand alone, Your Honor, as the sole factor in determining, uh, that they should stop, uh, Mr. Hankins in the automobile that he was in at the time. There were numerous other factors, regardless of the brief statement. What's the worst factor? Usually there's something really jumping out at you. What's the worst factor? That these are car burglars. What's the one that jumps off the page? There's no certain worst factor here. It's the combination of all the factors. They're driving slowly at night. No, but wouldn't you be driving slowly if you're looking for your dog? You can't drive around fast. You're looking for Duchess, the dog. Well, I think the fact that the vehicle was registered so far away. Okay. And what case do you have where that's ever even been listed as a factor? Not stolen, registered 10 miles away. What case is that? If nothing else, that would support, uh, even if... I'm asking you for a case where any court has said registration a few miles away in a city is actually an incriminating one. What case? Any case? There's no case that we cited, Your Honor. But even if that's the case, there's no case that they have cited to suggest that the officer's conduct violated clearly established law, the second prong of the qualified immunity test. Do you agree if we conclude there is no reasonable suspicion here that then under the Graham factors, pointing guns at kids in a car, one of them 12 years old, would be objectively unreasonable? If there were no reasonable suspicion that these are car burglars, so it's just you're stopping people. There's no threat. There's no crime. They didn't flee. Would you agree? I mean, you... The facts don't support that. Well, if I'm asking you to assume if there were no reasonable suspicion of any crime, you're not saying that police officers are objectively reasonable when they just pull any car over and get out with drawn guns, are you? No, I wouldn't say that. So it really turns on reasonable suspicion of car burglars? Well... The force element. To some extent, but I want to point out that Pierre pointed his gun at the front passenger, not at the plaintiff, based on the plaintiff's own admission. And as far as Wheeler, his hands were raised, but Mr. Hankins was not even sure if he had a gun in his hand. He can't deny that perhaps he had a flashlight in his hand. So at best, at best, Wheeler, he can't say whether Wheeler even had a gun in his hand, possibly had a flashlight. And Pierre had a gun, but wasn't pointed at Mr. Hankins. It was possibly pointed at the front passenger and not... Where is the 12-year-old sitting? Front passenger. Oh, that is the passenger. So he's pointing it at a 12-year-old. But the 12-year-old is not a part of this lawsuit, Your Honor, nor is the driver. The gun was never pointed at Mr. Hankins. But you said it was the totality of the circumstances, so we're supposed to ignore that there was a 12-year-old in the car? No, no, I'm not suggesting that. The totality of the circumstances is the basis for the reasonable suspicion for the stop. Well, the totality is everything that occurred in the circumstances. Counsel, let me suggest one other line of thought that comes to my mind, is that we normally see these cases as a pretextual stop. The law is very generous to police officers in allowing them to find some violation, some supposed violation, for which they would otherwise not have any interest in prosecuting, other than they use that as a pretext to then conduct a search and go forward itself. And many people are critical of that whole concept of pretextual stops, etc., a doctrine which we've had in place of the opinion of Justice Scalia. And it has enormous consequence across the country. However, in all those cases, what you're talking about is there is some violation, even though it's the kind of a violation that the officer who otherwise would not have any real interest in. I followed the—I thought this person was at the wrong place at the wrong side of time, so I fell in behind them until they crossed into—made a lane change. And so I stopped them for that reason. And that's good enough. So that's the context in terms of what we really see in most of these cases. In this case, it's most unusual because I'm not hearing an articulation of even a pretext of stopping for a violation. In other words, you have to have even the pretextual doctrine, as generous as that is to police officers, you have to be able to articulate some violation. Well— On a typical pattern, I was following—I saw this car, and I was behind them, and a piece of paper flew out of the car, and I thought it might be throwing away drugs. And so I stopped them for that pretextual stop. But under Terry, you have a right to stop if you have a reasonable suspicion. And we've set forth the numerous factors as to why the officers thought the actions of the car were suspicious. And based on that, they decided to make a stop that lasted less than five minutes. Mr. Hankins never even got out of the vehicle. No one was arrested. No one was touched. And— But I'm saying to you, we have those in most of these pretextual stops. Almost the same kind of pattern itself, except with the lead to violence of the stop itself. But the predicate is always a violation. So driving—I don't hear that the kids or young people are doing anything wrong. In other words, they have reasonable suspicion. They just follow mentally. They were late through an intersection or whatever, at a rolling stop at a stop sign. And that's missing. Well, again, I think under Terry, the totality of the circumstances were such that all these factors made it reasonable. And Judge Fallon agreed that— It was a Terry stop. The stop was reasonable under the circumstances under Terry. Thank you. All right. All right, Mr. Tanner. We have your—thank you. All right. Ms. Wisdom. Thank you, Your Honors. I represent the Hanno officers. And I do want to echo Mr. Hanno's argument that there was no constitutional violation, but I'm here primarily to talk about supervisory liability, because that's the only reason they're in the case. Can you defend this as a Terry stop? Well, I think there's reasonable suspicion here. And I think it rests on things that Mr. Hanno didn't talk to you guys about, which is that this car— Please don't refer to us as you guys. I'm sorry. I'm very sorry, Your Honor. Your Honors talked about. The car was registered to a woman. When Mr. Officer Wheeler ran the plate, which was right after they left, the car comes back registered to a woman. There's no woman in the car. So if it's their car and they're driving around their neighborhood, or even in somebody else's neighborhood looking for a car, that element is gone. Whatever that element, it being their car, is supposed to add to the equation or negate reasonable suspicion, it's gone. And then he finds out it's registered in the east, which is many miles away, which begs the question, what are you doing looking for your dog so far away from your house? And why did you tell me you lived in this neighborhood if the car is registered many miles away? It all balls up into the totality of the facts which support reasonable suspicion to make the stop. So I do believe there was no constitutional violation, which was— Reasonable suspicion of what? That either the car was stolen or that they were burglarizing cars. Now, it wasn't reported. That doesn't mean it wasn't stolen and not reported. For young people, teenagers, driving the car of their parents, the registration wouldn't come back to them. What's so unusual about that? So two of the occupants of the car, the driver and Mr. Hinkins, were adults. They were not children. And I just don't believe that anybody in these days could necessarily discern the difference between a teen and an adult anyway. At my age, they all look the same. We can quote you on that. Yes. Do you want to be in the record? So, yes. But I do want to talk to you about supervisory liability because that's why the HANA officers are in the case. There's no dispute. They had nothing to do with what happened. Why was that officer there? This is otherwise no residential. So just give the context. Why is he there? We know our regular officers are there. So the Housing Authority. I'm sorry, Your Honor. I don't understand why it's promoted. As opposed to an NOPD officer being there, explain his presence, HANO. Okay. So HANO officers are allowed to work private details to earn extra money. It's really hard to get to hire police officers, and that is a perk that HANO offers its officers in order to entice them to work for it, as opposed to some other law enforcement agency. So they are allowed to do that. But beyond that, HANO has no real involvement in them working a private detail. And at this point, there's no— Nothing to do with HANO. It's just the fact that the officers work on an extra detail. Correct, Your Honor. Is that the point? Yes. Okay. Yes. That wasn't abundantly clear, but that's why I asked. Well, he's there. Very good point. Thank you. So in order to prove supervisory liability or to get beyond their qualified immunity defense to supervisory liability, they have to prove three things. One is that there was a failure to supervise train or discipline by the supervising officer. Two, they have to connect that causally to the constitutional violation that they say occurred. Three, then they have to go beyond that and show that the failure amounts to deliberate indifference, which is a pretty, pretty high bar. And they just— There's nothing on the record that supports that. The HANO officers shouldn't be in this case, and they are. And so if you find there was a constitutional violation during the stop, you can still rule on the basis of supervisory liability in favor of the HANO officers and affirm dismissal of the case against them. Now, in the reply brief that plaintiff submitted, he claimed that they didn't have adequate discovery on supervisory liability. That is false. They supervised all four HANO officers at length on that topic, Officer Pierre on that topic. They had Officer Pierre's HANO disciplinary records, HANO training records, but still they were unable to show anything that would get close to deliberate indifference in this case, Your Honors. And so you should affirm on the alternate basis in favor of the HANO officers that there was no supervisory liability in this case. All right. Thank you, Ms. Wilson. Thank you, Your Honors. All right. Back to you, Mr. Hayden, for any rebuttal. Thank you. So I would like to just begin with the vehicle registration information because I understood there's a focus both in terms of precedent and in facts here. So I want to point the court to United States v. Moreno-Chaparro that's cited at page 34 of our opening brief. It's 180F3-629. So this case involves the vehicle registration issue. In that case, a Mexican man was driving a car that was registered to, quote, a female in Texas. And this court found that that discrepancy between the sex of the driver, the sex of the registrant, and the distance was no basis for reasonable suspicion. It said that it was, quote, obvious that men drive cars registered to women. In that case, the man was driving his sister's car. In this case, a boy was driving his mother's car. Judge Stewart, as you suggested, it is not unusual or extraordinary for boys to drive cars registered to females. And we don't think that supports reasonable suspicion here. So we would encourage the court to review Moreno-Chaparro. In summary, Judge, it was inappropriate on the reasonable suspicion. Stop. It looks to me like Judge Fallon probably thought the excessive force connected to these being carbrokers. There be any reason for us to reach either supervisory liability, which he didn't address, injury, which he didn't address, or excessive force? How narrow an opinion would it be best to write? So I think as to the supervisory liability claims, they were, of course, they were dismissed because there was an absence of a predicate constitutional violation to that court. So I think if you agree with us that there was no qualified immunity, and there was the predicate, then the proper course there is to remand for those claims to be further developed. And again, we believe we didn't get the discovery on those claims we need. I think as to excessive force, much of it does. There's significant overlap as to the reasonable suspicion inquiry. But we do also believe that pointing the firearms there was unlawful. And so I think that the, I think the court certainly could reach the excessive force claim. And we think the officers are not entitled to qualified immunity on that as well. You said you did get the discovery. So what did you get? I'm talking about on the Hano piece. So what did you get? So my understanding, so I don't think the record is crystal clear. But my understanding of what the real delta between what was requested and what was obtained really related to supervisors and to training materials. I think that, you know, we discussed this sort of more broadly about qualified immunity doctrine. There is, you know, in the Fifth Circuit, you're often sort of limited to qualified immunity. One sentence. What's your theory as to the Hano guy? So I think we believe there was inadequate training. Effectively, no training or supervision of Officer Pierre and Officer Wheeler as to these, the night details. But I do, I do want to stress that these are claims that were not really fully developed and really fully briefed on appeal. We're clear on that. I just wanted to understand what the, you know, what the assertion was relative to them. Okay. We got you. Sure. And I see my time has expired. So we would encourage the court to reverse and remand. All right. Thank you, counsel, on both sides for your briefing and responding to the court's questions. The panel will stand in about a 10 minute recess before we take up 23.